## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-2726

Tina Heimerl,

      Plaintiff,

v.

The Prudential Insurance Company of America,

      Defendant.

---

## COMPLAINT

---

    Plaintiff, Tina Heimerl ("Ms. Heimerl"), through her undersigned counsel, submits this Complaint against The Prudential Insurance Company of America ("Prudential").

1.    This is a civil action for long term disability benefits owed to Ms. Heimerl arising under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, including 29 U.S.C. § 1132(a). Ms. Heimerl seeks judicial review of the termination of disability benefits by Prudential.

### PARTIES

2.    Ms. Heimerl is, and at all times relevant hereto was, a resident of Colorado.

3.    Prudential is an insurance company based in New Jersey. Prudential is registered with the Colorado Division of Insurance and does business in the State of Colorado.

4.    HCA Healthcare ("HCA") employed Ms. Heimerl as a Registered Nurse. HCA provided a Long Term Disability ("LTD") plan for its employees. Ms. Heimerl was a participant in this employee benefit plan (the "Plan"). Prudential issued a policy (the

"Policy") to HCA to insure these benefits. HEIMERL 13047-93.

5.     Prudential administered the Plan and made all determinations regarding Ms. Heimerl's eligibility for LTD benefits. Prudential determined Ms. Heimerl was disabled as of January 26, 2017, and terminated her benefits effective January 1, 2020.

## JURISDICTION AND VENUE

6.     The United States District Court in and for the District of Colorado has subject matter jurisdiction over this case pursuant to 29 U.S.C. § 1132(e)(1).

7.     Venue is proper in Colorado pursuant to 29 U.S.C. § 1132(e)(2) because Prudential conducts business in Colorado and has a registered agent in Colorado.

## MS. HEIMERL'S DISABLING CONDITIONS AND SURGERIES

8.     Ms. Heimerl suffers from the following medical conditions, without limitation: osteopenia and osteoporosis, chronic collapse (a.k.a compression fracture deformities) of the L3, T9, T-10, T-11, and T-12 vertebrae, multiple vertebral body fractures of the transverse processes and spinous processes, severe dextroscoliosis of the lumbar spine, thoracic kyphosis, right clavicle fracture, lower extremity radiculopathy, facet arthropathy, foraminal narrowing, spinal stenosis and spondylosis, degenerative disc and facet disease, right shoulder rotator cuff tear, right bicep tendinopathy, right acromioclavicular joint arthropathy, osteoarthritis of the left knee, deep vein thromboses, pulmonary embolisms, chronic pain syndrome, and chronic use of narcotic pain medication.

9.     Surgery 1 – On January 26, 2017, Ms. Heimerl underwent right shoulder

arthroscopy with debridement, rotator cuff repair, and subacromial decompression.[1]

10.     Surgery 2 – On May 4, 2017, Ms. Heimerl underwent bilateral L2-L3 laminectomies and bilateral L4-L5 laminectomies with left foraminotomy.

11.     Surgery 3 – On July 7, 2017, Ms. Heimerl underwent right L2-L3 foraminotomy and bilateral L3-L4 laminectomies.

12.     Surgery 4 – On August 2, 2017, Ms. Heimerl underwent L2-L3 decompression and fusion with hardware.

13.     Surgery 5 – On April 19, 2018, Ms. Heimerl underwent a T10-S1 fusion (thoracic, lumbar, and sacrum) including removal of previously installed hardware, additional laminectomies, facetectomies, T9 and T10 vertebroplasties, and placement of biomechanical cages and screws and bone grafts.

14.     Surgery 6 – On November 15, 2018, Ms. Heimerl underwent bilateral SI joint fusion with pelvic instrumentation and iliac bolts, removal of previously installed pelvic fixation instrumentation.

15.     Surgery 7 – On June 14, 2021, Ms. Heimerl underwent a left total knee arthroplasty.

**SUMMARY OF MS. HEIMERL'S MEDICAL TREATMENT AND IMAGING**

16.     On October 11, 2016, approximately three months prior to leaving work, Ms.

---

[1] HEIMERL 1-16278 document references are Ms. Heimerl's initial disclosures, containing the full administrative record and nothing more, which were served to Prudential at the time of service of this Complaint in order to assist Prudential in providing complete responses to each and every allegation stated herein.

Heimerl presented to the Colorado Brain & Spine Institute ("CBSI") for a neurosurgical consultation for chronic back pain.  HEIMERL 5986-5990.

17.     At this visit, the doctor noted that Ms. Heimerl had been experiencing back pain for 2-3 years with a steady decline and negligible relief from trigger point injections and intensive chiropractic treatment. Dr. Buchanan diagnosed chronic pain and narcotic use and ordered imaging.

18.     Ms. Heimerl underwent spine x-rays, a thoracic MRI, and a lumbar MRI, and returned to Dr. Buchanan who recommended a lumbar epidural steroid injection.

19.     Meanwhile, Ms. Heimerl treated for her right shoulder. She underwent an MRI on December 16, 2016, which revealed a 2.5 cm full-thickness tea of her rotator cuff. HEIMERL 5514- 5515. The orthopedic surgeon recommended surgery and performed it on January 26, 2017.  HEIMERL 13190-13194.

20.     On January 20, 2017, Ms. Heimerl underwent a L4-L5 interlaminar epidural steroid injection which did not improve her symptoms. HEIMERL 9667-9668.

21.     On February 22, 2017, Ms. Heimerl underwent a L2-L3 interlaminar epidural steroid injection which likewise did not improve her symptoms. HEIMERL 9641-9642.

22.     On April 4, 2017, Ms. Heimerl returned to CBSI with complaints of ongoing low back and lower extremity pain. In discussing surgery with Dr. Buchanan, she explained that she did not want to do another surgery because she had just had her shoulder surgery and wanted to get back to her job as a nurse in the PACU. However, only two weeks later, Ms. Heimerl returned with worse symptoms causing difficulty with balance and claudication. Ms. Heimerl scheduled surgery. HEIMERL 5963-5968.

23.     On May 4, 2017, Ms. Heimerl underwent her first back surgery. HEIMERL 9405-

9407. Ms. Heimerl returned to CBSI on May 30, 2017, and discussed her persistent low back and leg pain. Dr. Buchanan ordered a second lumbar MRI. HEIMERL 9195-9197.

24.     On June 13, 2017, Ms. Heimerl returned to Colorado Orthopedic Consultants. During this visit, Ms. Heimerl explained that she was doing well with respect to her shoulder. Dr. Nathan Faulkner released her to light duty and planned to release her to full activity in two months. HEIMERL 13246-13250.

25.     Prudential continued to provide short term disability ("STD") and LTD benefits given the restrictions and limitations Ms. Heimerl faced as a result of her spine conditions.

26.     On June 25, 2017, Ms. Heimerl went to the emergency room due to sudden significant back pain and right leg pain. She underwent her third lumbar MRI. HEIMERL 9151-9157.

27.     On July 7, 2017, and July 26, 2017, Ms. Heimerl underwent her second and third back surgeries. HEIMERL 8932-8934 and HEIMERL 8292-8295.

28.     On August 20, 2017, nearly four weeks after her lumbar fusion and while still wearing her back brace, Ms. Heimerl fell backwards away from her walker while trying to get a glass of water. The fall was so bad that Ms. Heimerl sustained a comminuted right clavicular head fracture and mild displacement. HEIMERL 5511-5512.

29.      On September 12, 2017, Ms. Heimerl returned to CBSI reporting significant improvement in her right lower extremity pain and low back, but worsening pain in her left lower extremity. She underwent a lumbar CT which revealed loosening of the screws of the hardware for the fusion, progressive collapse of the L3 vertebral body, and severe left foraminal narrowing with impingement. HEIMERL 5938-5941.

30.     On December 5, 2017, Ms. Heimerl underwent another lumbar CT. HEIMERL 63.

31.     On December 15, 2017, Ms. Heimerl returned to CBSI. Dr. Buchanan told her he would discuss with his colleagues her conditions, response to surgeries, and imaging and develop a plan given that she was four months post fusion and still in significant pain. HEIMERL 60-64.

32.     On January 9, 2018, Ms. Heimerl underwent a scoliosis spine study which revealed severe dextroscoliosis and multiple vertebral body fractures and defects. HEIMERL 5502.

33.     On April 16, 2018, Ms. Heimerl underwent a fourth lumbar MRI which revealed multilevel neural foramen stenosis, multilevel nerve root impingement, scoliosis, and vertebral body fractures. HEIMERL 5498-5499.

34.     On April 17, 2018, Ms. Heimerl returned to Dr. Buchanan who recommended removing the prior lumbar fusion hardware and installing new hardware to fuse the entire lumbar spine (5 vertebrae) to the three thoracic vertebrae above the lumbar spine and to the sacrum below. HEIMERL 7029-7034. Dr. Buchanan performed this 9-level fusion on April 19, 2018. HEIMERL 7234-7238.

35.     On July 17, 2018, three months later, Ms. Heimerl returned to CBSI noting improvement, but still walking with two canes, still requiring regular narcotic use for pain control, and worsening hip and foot pain. HEIMERL 5914-5917.

36.     On July 17, 2018, Ms. Heimerl underwent a left hip x-ray which revealed loosening of the fusion screws in her sacrum. HEIMERL 5496.

37.     On August 17, 2018, Ms. Heimerl underwent another CT of her lumbar spine and another CT of her thoracic spine. These CT scans revealed multilevel fusion hardware loosening and new multiple vertebral fractures. HEIMERL 5490-5493.

38.     On August 28, 2018, Ms. Heimerl returned to Dr. Buchanan who recommended a

"reop" – removal of the pelvic screws with replacement to a new location in hopes of avoiding having to extend the spinal fusion further up into the thoracic spine. Dr. Buchanan also recommended bilateral sacroiliac joint fusions. HEIMERL 46-51.

39.    At this point, approximately four and a half months post the extensive thoracic-lumbar-sacrum fusion, Ms. Heimerl still required narcotics for pain control.

40.    On September 17, 2018, Ms. Heimerl underwent a fifth lumbar MRI and third thoracic MRI. The thoracic MRI revealed degenerative changes adjacent to the fusion beginning at T10 and new disc bulging at T9-T10 causing moderate central canal stenosis. HEIMERL 5488-5489.

41.    On November 15, 2018, Ms. Heimerl underwent her fifth back surgery. HEIMERL 6584-6587.

42.    On December 11, 2018, Ms. Heimerl returned to CBSI and stated she was recovering well and weaning off narcotic pain medication. Dr. Buchanan noted that Ms. Heimerl was pleased with her improvement thus far and "anxious to start outpatient PT." His plan was to begin physical therapy and to "begin to return to normal activity slowly." HEIMERL 44-45.

43.    At this point, Ms. Heimerl was still hopeful about her recovery and return to some degree of "normal activity."

44.    Ms. Heimerl completed 19 visits of physical therapy between January 10, 2019, and April 12, 2019. HEIMERL 188-234.

45.    On May 10, 2019, Ms. Heimerl underwent a lumbar CT which revealed progression of the T10 vertebral compression deformity (collapse), greater degree of angular kyphosis, loss of disc height at T9-T10, loosening of some of the fusion hardware screws,

and chronic vertebral fractures. HEIMERL 5482- 5483.

46.     On May 14, 2019, Ms. Heimerl returned to CBSI, unfortunately still reliant on narcotics, still unable to walk without assistive devices in both hands, and still experiencing pain in multiple areas of her back, sacrum, and lower extremities, making it extremely painful to sit given the multiple nonhealing fractures in her sacrum. Dr. Buchanan noted the progression of all concerns and referred her to a pain management specialist. HEIMERL 35-40.

47.     On August 6, 2019, Ms. Heimerl underwent a thoracic x-ray which unfortunately showed no significant healing of the multiple vertebral body fractures and confirmed the failure of the fusion hardware at the T10 level. HEIMERL 5480.

48.     On August 13, 2019, Ms. Heimerl returned to CBSI reporting a burning pain in her thoracic spine when sitting, making prolonged sitting unbearable. Dr. Buchanan expressed concerns about these new symptoms and the known progression of the compression deformity at T10. Dr. Buchanan ordered a thoracic CT. Dr. Buchanan discussed that Ms. Heimerl will likely require an extension of her fusion to address the progressive thoracic kyphosis. HEIMERL 26.

49.     On September 6, 2019, Ms. Heimerl underwent a thoracic CT which revealed chronic compression fracture deformities not only at T10, but also at T9, T11, and T12. HEIMERL 5478-5479.

50.     These three new thoracic vertebral body compression fractures were in addition to the chronic, nonhealing compression fractures previously identified in Ms. Heimerl's lumbar spine and sacrum.

51.     On September 12, 2019, Ms. Heimerl presented to Colorado Clinic for a pain

management consultation. The doctor there diagnosed chronic pain syndrome and long-term use of opiate prescriptions. He noted that she had 5 back surgeries in 2 years yet continued to suffer from significant spinal pathology. The doctor continued Ms. Heimerl's then current prescriptions. HEIMERL 13385-13388.

52.     On September 24, 2019, Ms. Heimerl returned to CBSI. She and Dr. Buchanan discussed the burning pain in her thoracic spine at the level of the three new vertebral compression fractures just above the fusion which developed after the "reop" and sacroiliac joint fusion surgery in November 2018. Dr. Buchanan noted: "She is not interested in any further intervention at this time." He advised her to return in four months. HEIMERL 22-25.

53.     At this point, Ms. Heimerl had endured five back surgeries, each of which leading to new pain. Ms. Heimerl had tried chiropractic care, physical therapy, and different types of spinal injections at multiple levels, each without benefit. Ms. Heimerl had undergone over 20 spinal imaging studies, each documenting spinal pathology.

54.     Because of her advanced osteoporosis, Ms. Heimerl's vertebrae cannot heal from the trauma of the multiple surgeries and hardware installations. Imaging confirms again and again vertebral compression fractures, endplate fractures, spinous process fractures, transverse process fractures, and the failure of the spine to fuse as intended.

55.     By letter dated December 18, 2019, Prudential terminated Ms. Heimerl's LTD benefits stating that medical documentation, post-surgical changes, and her reported level of activity indicate she was capable of sedentary to light physical exertion for forty hours a week, week after week, and therefore no longer disabled.

56.     Ms. Heimerl returned to CBSI in January 23, 2020 (HEIMERL 13777-13779) and

continued with pain management at Allpria Healthcare after Colorado Clinic closed. On April 6, 2020, Ms. Heimerl explained that she would not consider undergoing another spine surgery unless she ended up in the hospital due to pain. HEIMERL 5707-5710.

57.     On September 28, 2020, Ms. Heimerl began treatment at Orthopedic Centers of Colorado for left knee pain HEIMERL 13753 and underwent a left total knee arthroplasty on June 14, 2021. HEIMERL 13762-13764.

58.     As of the date of this filing, Ms. Heimerl still attends the pain clinic at Allpria Health monthly and still requires narcotics and gabapentin to manage her pain.

59.     Most recently, Ms. Heimerl has been addressing the severe pain in her left foot. She returned to Dr. Buchanan on July 19, 2022. He referred for her additional imaging and an ultrasound.

60.     Ms. Heimerl continues to have immense pain that limits everything she does in her life. She still sleeps upright in a reclining chair as she has since 2017. Lying flat on a bed or being in any other stiff supine or upright positions, as in a desk chair at a computer desk, cause significant spasms that temporarily immobilize her.

61.     Ms. Heimerl still has monthly INR checks to confirm the absence of any blood clots or embolisms, as Ms. Heimerl experienced several after each of the multiple surgeries. Ms. Heimerl still takes Coumadin, an anticoagulant, daily and will for the rest of her life. The risk of blood clots and frequently fatal pulmonary embolisms and the required use of blood thinners are major causes for concern for Ms. Heimerl and her providers when discussing any future surgeries.

62.     Ms. Heimerl's lower back and hips are still very painful, no different than shortly after her fifth back surgery in November 2018. The burning sensation and pain

surrounding the multi-level compression fracture deformities in her lower thoracic spine has progressed. Ms. Heimerl continues to treat with CBSI and her primary care provider for pain management and surveillance of her thoracic kyphosis.

## MS. HEIMERL'S LTD CLAIM WITH PRUDENTIAL

63.     The Plan provides LTD benefits for the first 24 months of disability if Prudential determines the Plan member is unable to perform her own "regular occupation." After 24 months, a member is entitled to LTD benefits if Prudential determines she is "unable to preform the duties of any gainful occupation." "Gainful occupation" requires an income that provides the Plan member with 60% of her monthly earnings. HEIMERL 13551-52.

64.     Ms. Heimerl received short term and then long-term disability benefits through the "regular occupation" 24-month period and then for another approximately 6 months into the "gainful occupation" period. HEIMERL 13549.

65.     Prudential approved LTD benefits for Ms. Heimerl on June 12, 2017. In its approval letter, Prudential outlined two benefits provided to Ms. Heimerl as part of the Plan. First, Prudential promised to assist Ms. Heimerl in her return to work, stating: "We will work with you…" Second, Prudential "committed" to facilitate Ms. Heimerl's return to work through the policy's provision of supplementing actual earnings with ongoing LTD benefits to reach 100% pre-disability earnings for up to 12 months. HEIMERL 13555.

66.     Despite determining that Ms. Heimerl was able to return to work, Prudential never offered these Plan benefits to Ms. Heimerl.

## SSA'S FULLY FAVORABLE DISABILITY DETERMINATION

67.     Prudential assigned a non-attorney representative to assist Ms. Heimerl in her application for Social Security Disability Insurance ("SSDI") benefits. HEIMERL 5212.

68.     On September 14, 2017, the Social Security Administration ("SSA") conducted its interview with Ms. Heimerl. HEIMERL 005211-12. On February 27, 2018, the SSA determined that Ms. Heimerl was unable to perform substantial gainful activity due to her medical conditions and therefore entitled to SSDI benefits. HEIMERL 5213-16.

69.     SSA listed Ms. Heimerl's disability as due to severe degeneration of her spine. HEIMERL 5163.

70.     Prudential benefited from Ms. Heimerl's SSDI award because Prudential offsets its LTD payments by the amount of the SSDI payments.

71.     The SSA definition of disability is: "the inability to do any substantial gainful activity ["SGA"] by reason of any medically determinable physical or mental impairment." C.F.R. § 404.1505.

72.     A person who is earning more than a certain monthly amount is ordinarily considered to be engaged in SGA. In 2019, the SGA amount was $1,220 per month. https://www.ssa.gov/oact/cola/sga.html.

73.     The SSA full retirement age for Ms. Heimerl is age 66 years and 6 months.

74.     Ms. Heimerl continues to receive SSDI benefits and will likely continue to receive those benefits until reaching full retirement age in June 2024 because SSA determined "medical improvement not expected." HEIMERL 16061.

**PRUDENTIAL'S TERMINATION OF BENEFITS**

75.     On December 18, 2019, Prudential terminated Ms. Heimerl's LTD benefits effective January 1, 2020. HEIMERL 13546-54. In its termination letter, Prudential enclosed a two-page list of websites titled "Job Preparation And Job Seeking Resources." Prudential never offered to partner with her in a return to work or offer to provide her with

partial LTD benefits as she transitioned into full-time gainful employment.

76.    In support of its termination, Prudential considered Ms. Heimerl's medically reasonable decision not to undergo a sixth back surgery as proof she can return to full-time work. HEIMERL 13547.

77.    Prudential took evidence of Ms. Heimerl's activities of daily living ("ADLs") as evidence that she was able to work full-time in a gainful occupation. HEIMERL 13547.

78.    The Plan does not address how evidence regarding ADLs is to be considered when assessing whether an LTD beneficiary can return to full-time gainful occupation.

79.    Prudential concluded that as of January 1, 2020, Ms. Heimerl was able to earn an hourly wage of at least $20.98, which is 60% of her pre-disability earning, and therefore a "gainful" wage according to the terms of the Policy. HEIMERL 13548.

80.    The 2020 SSA SGA amount of $1,260 is less than Prudential's gainful wage for Ms. Heimerl of $3,356.80. As such, SSA's definition of disability requires a higher burden of proof than Prudential's, yet Prudential determined Ms. Heimerl was no longer disabled.

81.    In its termination letter, Prudential stated: "We have noted that you were approved for Social Security Disability Benefits (SSDB) and we have taken this into consideration." HEIMERL 13549. There is no evidence Prudential never analyzed SSA's finding of disability for Ms. Heimerl.

82.    Prudential failed to offer Ms. Heimerl any and all occupation rehabilitation despite such services being listed in the Policy.

83.    Prudential failed to consider how Ms. Heimerl's level of pain affects her actual ability to sustain physical and cognitive demands over a typical workday.

84.    Prudential failed to consider Ms. Heimerl's ability to perform the duties of a gainful

occupation 5 days a week and week after week.

85.     Prudential failed to consider the effects of Ms. Heimerl's chronic narcotic use on her ability to perform the duties of any gainful occupation it identified.

86.     Prudential failed to explain to Ms. Heimerl what it considers "restrictions and limitations," how those two words differ, and how Prudential uses all evidence provided in order to conclude what it considers to be Ms. Heimerl's restrictions and limitations.

87.     Prudential failed to obtain evidence from Ms. Heimerl as to her own limitations which would be relevant to the three occupations it determined Ms. Heimerl was capable of performing on a full-time basis as of January 1, 2020.

88.     Prudential failed to reasonably address the limitations and restrictions provided by her treating physician Dr. McCollum.

89.     Prudential failed to consider any actual physical or mental limitation. Instead, Prudential only considered physical restriction determined by its reviewing physicians and employees.

90.     Prudential failed to weigh all evidence equally. The Plan does not require an LTD beneficiary to produce forms from her doctors detailing physical restrictions, yet Prudential valued its own determination of Ms. Heimerl's "restrictions and limitations" above all other evidence.

91.     In its termination letter, Prudential failed to describe the additional material and information necessary to perfect the claim and failed to provide an explanation of why such material is necessary. HEIMERL 5264. This is a required component of termination letters pursuant to claims handling procedures under ERISA and Prudential's Policy.

92.     Prudential failed to explain how Ms. Heimerl was to prove the extent of her

disability and only stated that what was submitted was not sufficient to prove disability.

**MS. HEIMERL'S FIRST APPEAL**

93.     On June 30, 2020, Ms. Heimerl submitted her first appeal of Prudential's termination of benefits and provided additional medical records, expert reports, and other evidence of her ongoing medical conditions which rendered her disabled under the terms of the Policy. HEIMERL 1-4082.

94.     The Policy states proof of claim must show "The extent of your disability, including restrictions and limitations preventing you from performing your regular occupation or gainful occupation," but the Policy does not define "restrictions" or "limitations," nor does it state what evidence can or must be provided to document either.

95.     Ms. Heimerl underwent a multi-day functional capacity evaluation ("FCE") beginning on June 24, 2020. Kristine Couch, OTR, the registered occupational therapist, tested, observed, and documented Ms. Heimerl's restrictions and limitations. This report was provided to Prudential. HEIMERL 548-83.

96.     Ms. Couch performed 30 tests and found Ms. Heimerl to have given consistent effort in all.  HEIMERL 550. There is no evidence Ms. Heimerl feigned weakness or showed any signs of malingering.

97.     Ms. Couch noted numerous impairments as relates to Ms. Heimerl's ability to sustain purposeful activity in any type of employment setting, including: maximum seated tolerance of 57 minutes; maximum standing tolerance of 19 min; maximum walking distance of 50 feet with serious balance concerns given Ms. Heimerl's use of two canes and dragging her legs forward; and the inability to perform many occupational activities even on an occasional basis or even not at all. HEIMERL 552.

98.    Ms. Couch concluded: "Ms. Heimerl is no longer capable of securing or maintaining full-time employment in any capacity secondary to the impairments noted in this evaluation." HEIMERL 553.

99.    Ms. Heimerl also included a personal statement and statements from friends and family to provide additional evidence of her restrictions and limitations. HEIMERL 584-596.

100.   Ms. Heimerl retained Dan Best, MA, CRC (certified vocational rehabilitation counselor), for a vocational evaluation and employability assessment. As part of his evaluation, Mr. Best interviewed Ms. Heimerl and reviewed all medical records provided to Prudential at that time and with the first appeal. HEIMERL 597-665.

101.   Ms. Best concluded Ms. Heimerl is unable to qualify for the jobs suggested by Prudential and will likely remain incapable of any return to full-time gainful employment. HEIMERL 605.

**PRUDENTIAL'S DENIAL OF MS. HEIMERL'S FIRST APPEAL**

102.   On October 22, 2020, Prudential denied Ms. Heimerl's first appeal and reaffirmed its December 18, 2019, decision to terminate benefits. HEIMERL 12987-12994.

103.   Prudential did not analyze the FCE report and failed to mention it in its appeal denial letter dated October 22, 2020.

104.   Prudential has no evidence to contest the validity of Ms. Heimerl's FCE.

105.   Prudential did not analyze the statements provided by Ms. Heimerl or her friends and family to determine how the restrictions and limitations outlined in the statements would relate to performing a full-time gainful occupation.

106.   Prudential's vocational consultant did not interview Ms. Heimerl and failed to

review all of Ms. Heimerl's medical records, the FCE report, and the personal statements from Ms. Heimerl and her friends and family.

107.    Prudential has no evidence to discredit Dan Best, MA, CRC, or his conclusions.

108.    Prudential failed to assess Ms. Heimerl's ability to perform duties of a gainful occupation on a full-time, consistent basis, day-after-day and week-after-week.

109.    Prudential's Senior Appeals Analyst gave deference to the initial claim decision by stating the same vocational analysis previously provided in the termination letter and by again failing to actually analyze the SSDI fully favorable determination of disability.

110.    Prudential further failed to provide a full and fair review of Ms. Heimerl's appeal by simply citing evidence Ms. Heimerl provided but failing to analyze the impact it had on Prudential's decision.

111.    Prudential failed to explain why it valued the opinion of its reviewing physician above the opinions of Ms. Heimerl's own treating physicians.

**MS. HEIMERL'S SECOND APPEAL**

112.    On October 20, 2021, Ms. Heimerl submitted her second appeal of Prudential's termination of benefits and provided additional evidence. HEIMERL 4083-5252.

113.    Ms. Heimerl provided Prudential with the SSA disability documents she received. HEIMERL 4419-5252. In the "Findings of Fact and Analysis of Evidence," the SSA analyst could not locate even 3 jobs in the economy that Ms. Heimerl could perform given her residual functional capacity and experience. HEIMERL 5160-5162.

114.    Dan Best, MA, CRC, provided a supplemental opinion and review of Prudential's vocational assessment and market analysis. HEIMERL 4185-4189. Mr. Best stated:

> Clearly, utilizing the levels of functional capacity and overall work capability described by Ms. Heimerl, within the results of the functional capacities

testing by Kristin Couch OTR, and as prescribed by her treating physician, Dr. McCollum, Ms. Heimerl has no residual capacity to return to any form of regular, reliable, competitive employment. Her restrictions and limitations simply will not allow her to meet the basic tenants of "competitive employability." If all that information is ignored for some reason, however, and only the opinions of Ms. Mumm or Dr. Kohan [Prudential's reviewing physician] are given credence, Ms. Heimerl would still encounter substantial difficulties in terms of "realistic employability." HEIMERL 4187.

115.    On December 6, 2021, Prudential provided Ms. Heimerl a report authored by Dr. Vincent, Prudential's retained physician. Ms. Heimerl provided a response dated January 14, 2022, addressing the functional limitations Dr. Vincent found Ms. Heimerl to have despite not physically examining Ms. Heimerl in December 2019 when Prudential terminated benefits or in November 2021 when he authored his report.

116.    Based on Dr. Vincent's restrictions, Ms. Heimerl's functional capacity falls below the "sedentary" capacity as defined by three federal sources. SSR 83-10; C.F.R. § 404.1567; and U.S. Dept. of Labor, Dictionary of Occupational Titles, Appendix C. HEIMERL 5302-05.

**PRUDENTIAL'S DENIAL OF MS. HEIMERL'S SECOND APPEAL**

117.    On January 22, 2022, Prudential denied Ms. Heimerl's second appeal and reaffirmed its December 18, 2019, decision to terminate benefits. HEIMERL 5306-5317.

118.    Neither the Plan nor the Policy defines "sedentary," and Prudential itself never defined the term in its handling of Ms. Heimerl's claim. Yet, Prudential adopted definitions that support its decision to terminate in dereliction of its fiduciary duties to act in Ms. Heimerl's best interests and to provide Ms. Heimerl with descriptions of rules and guidelines used in violation of ERISA claims handling procedures. HEIMERL 5264.

119.    The Plan's definition of disability is essentially the same as SSA's – the inability to perform the duties of a job for which one is qualified. Prudential never analyzed the SSA's

disability finding or the evidence, expert opinions, and Ms. Heimerl's statements that led to the fully favorable finding of disability.

120.    Prudential has no medical evidence to suggest that Ms. Heimerl's physical and mental conditions have improved since February 2018 when SSA awarded SSDI benefits.

121.    Prudential has no medical evidence to suggest that Ms. Heimerl's physical and mental conditions have improved since December 2019 when it terminated benefits.

122.    Prudential's reviewing physician Dr. Vincent concluded:

> Currently, the claimant remains with extensive and severe pain symptoms including the lower back and lower extremities, likely related to extensive surgical changes with extensive hardware and associated scar tissue and considering extremes of morbidity with multiple surgeries along with clinical findings of limited range of motion, weakness, difficulty walking, and altered sensation, the claimant is physically impaired. HEIMERL 5310-11.

123.    Dr. Vincent further concludes that he is unable to conclude from his review of the medical records that total occupational functioning is precluded. Prudential manipulates Dr. Vincent's opinion and states: "Ms. Heimerl's abilities are sustainable on a full-time basis." HEIMERL 5311. Prudential does not compare what remaining occupational functioning Ms. Heimerl might have according to Dr. Vincent to being able to sustain full-time work at the three jobs Prudential identified as "gainful" employment.

**BENEFITS OWED TO MS. HEIMERL**

124.    As of the present date, Prudential continues to withhold Ms. Heimerl's LTD benefits and maintains that she is not disabled even though it has substantial evidence that her medical conditions prevent her from performing the duties of any gainful occupation.

125.    The LTD Policy provides that benefits will be paid until the "normal retirement age" according to the Social Security Administration. Ms. Heimerl's normal retirement age is 66 years and 6 months.

126.    When Prudential terminated her LTD benefits effective January 1, 2020, Ms. Heimerl was 62 years old. Ms. Heimerl has 4 years and 6 months of LTD benefits from the date of termination to the maximum benefit duration (through June 21, 2024).

127.    Ms. Heimerl's LTD benefit amount at the time of termination was approximately $3,636.36 (HEIMERL 5256) and her SSDI benefit amount at the time was approximately $2,499.80. Prudential takes the SSDI benefit as an offset resulting in a payment of LTD benefits due from Prudential in the amount of approximately $1,137 per month.

128.    Not taking into consideration inflation and cost of living increases, 4 years and 6 months (54 months total) of benefits totals approximately $61,398.

## CLAIM FOR RELIEF

129.    Ms. Heimerl is a Plan member and has exhausted all administrative remedies required under ERISA and has performed all of her obligations pursuant to the Plan.

130.    Since January 2017, Ms. Heimerl has been under the regular care of a doctor.

131.    Prudential owed Ms. Heimerl a fiduciary duty and the duties of good faith and fair dealing when handling her claim for LTD benefits. HEIMERL 5260.

132.    Prudential confirms its duties and claims procedures owed to employee benefit plan members in its Group Disability Memorandum 2015. HEIMERL 5259-5272.

133.    Prudential has an indisputable conflict of interest in the claims administration process in this case because Prudential determines the validity of Ms. Heimerl's claim and is also responsible for paying all disability benefits Prudential approves.

134.    This conflict of interest contributed to Prudential's unwarranted termination of Ms. Heimerl's benefits.

135.    Any clause purporting to provide administrative discretion or deference to

Prudential is void pursuant to C.R.S. § 10-3-1116.

136.    Ms. Heimerl is entitled to past benefits due since January 1, 2020, to the present, as she met and continues to meet the definition of disability in the Policy.

137.    In all likelihood, Ms. Heimerl is entitled to future LTD benefits until she reaches the age of 66 years and 6 months (June 2024) as it appears her medical conditions and physical abilities will continue to preclude full-time gainful employment.

138.    Prudential unreasonably, erroneously, and/or capriciously terminated Ms. Heimerl's LTD benefits due under the Plan.

139.    Prudential breached its obligations to Ms. Heimerl by failing to fulfill its obligations under the Plan and under the applicable provisions of ERISA.

140.    Prudential's acts and omissions in this case constitute procedural irregularities.

141.    Prudential's wrongful conduct in this case includes but is not limited to:

     a.  Failing to reasonably consider all pertinent medical information, including the opinions of Ms. Heimerl's treating physicians, imaging, and the FCE;

     b.  Failing to provide a full and fair investigation of the claim prior to termination;

     c.  Failure to provide a full and fair review of Ms. Heimerl's two appeals;

     d.  Failing to act in Ms. Heimerl's best interests;

     e.  Failing to reasonably interpret and apply Policy and Plan terms; and

     f.  Failing to reasonably consider the SSA's fully favorable finding of disability despite requiring Ms. Heimerl to apply and then taking the full SSDI payment awarded to Ms. Heimerl.

142.    Prudential's wrongful conduct has caused injuries and damages to Ms. Heimerl, including the loss of LTD benefits, attorney fees, expert fees, and costs.

143.   Ms. Heimerl is entitled to receive all LTD benefits under the Plan from the effective date of the termination of benefits, interest, attorney fees, and costs pursuant to ERISA § 502(g) and 29 U.S.C. § 1132(g).

**WHEREFORE**, Ms. Heimerl requests the Court grant the following relief:

a.      Declaratory judgment that Prudential wrongfully terminated Ms. Heimerl's benefits;

b.      Injunctive relief ordering Prudential to pay all past due benefits and reinstate LTD Plan benefits or payout all future benefits;

c.      Order Prudential to pay prejudgment and post-judgment interest at the highest rate allowed by law on all past due benefits;

d.      Order Prudential to pay all costs and reasonable attorney fees; and

e.      Grant such other relief as the Court deems just and proper.

**DATED:** October 14, 2022.

_/s/ Dale G. Casares_
Dale G. Casares, #45054
CASARES LAW, LLC
200 S Wilcox St., #534
Castle Rock, Colorado 80104
dale@casareslawllc.com
Phone: (303) 622-5222
Fax: (877) 384-2804
_Attorney for Plaintiff_